*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ASHLEY ANN PIERCE,

        Defendant-Appellant.

UNPUBLISHED
February 1, 2024

No. 363640
Allegan Circuit Court
LC No. 2022-024955-FH

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

RICK, J. (*dissenting*).

I respectfully dissent from the majority's decision to affirm. While I agree with the majority's recitation of most of the facts[1] and the standard of review, it is my opinion that the prosecutor failed to present sufficient evidence of specific intent to justify convicting defendant of felonious assault, MCL 750.82, or domestic violence, MCL 750.81(2). I would reverse defendant's convictions and sentences.

Felonious assault and domestic violence are both specific-intent crimes. Specifically, to sustain a conviction of felonious assault, the prosecutor must show that the defendant had " 'the intent to injure or place the victim in reasonable apprehension of an immediate battery.' " *People v Nix*, 301 Mich App 195, 205; 836 NW2d 224 (2013), quoting *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). Similarly, to sustain a conviction of domestic violence, the prosecutor must show that "the defendant either intended to batter the victim or that the defendant's

---

[1] I disagree with my colleagues' conclusion that defendant had knowledge that BP was texting his father throughout the evening leading up to the misfortunate event. In my opinion, the record does not support this conclusion. Defendant consistently testified she was unaware this was taking place. It appears the majority bases its conclusion exclusively on the testimony of BP, defendant and Sean's minor child. It is axiomatic that a witness may only testify based on personal knowledge. MRE 602. Without the requisite foundational testimony, BP could not and should not have testified about what his mother may have known.

unlawful act placed the victim in reasonable apprehension of being battered." *People v Corbiere*, 220 Mich App 260, 266; 559 NW2d 666 (1996).

On de novo review, this Court must "determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Haynes*, 338 Mich App 392, 417; 980 NW2d 66 (2021) (citation omitted). Additionally, "[t]his Court must resolve all conflicts in the evidence in favor of the prosecution." *Id*. (citation omitted). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). Even so, such inferences "must have adequate basis in record evidence." *People v Hoffmeister*, 349 Mich 155, 159; 229 NW2d 305 (1975).

The majority states that a reasonable trier of fact could infer from the evidence presented that defendant harbored ill will toward Sean because of an ongoing custody dispute over their children, and that she reversed her minivan with the intent to strike Sean with the passenger side door. Further consideration of that first fact is key. These parties were previously married. They have one child in common. The record reveals that their post-judgment relationship had devolved to the point that defendant's parenting time with their child, BP, had been suspended for several months. BP had been living exclusively with Sean since April 2019. The date of this incident, November 11, 2019, was the first time that defendant had seen BP in several months. The record reveals that during defendant's parenting time, Sean was in telephone contact with BP for hours, rather than with defendant. The record also reveals that Sean had previously obtained a PPO against defendant. Despite this very fractured and highly contentious situation, Sean had his current spouse drive him to defendant's home to confront defendant about returning BP to him. What could possibly go wrong?

Defendant was oblivious to the fact that Sean had contacted BP until the parties' confrontation in defendant's driveway. Tempers flared and all sense of reason was suspended as defendant and Sean both yelled at the other in front of their child, as well as defendant's other children,[2] who were seated in the defendant's van. The record indicates that just before defendant put the van in reverse, she and Sean were engaged in a shouting match. Witness testimony varied as to whether the front passenger door was open the entire time they were arguing, or whether BP opened the door while trying to step out of the minivan. Suffice it to say that the door was open at some point, and that it struck Sean and knocked him over when defendant put the car in reverse. Defendant testified that Sean was punching the passenger door and yelling at her when she suggested that BP stay with her for the night. Defendant further testified:

*Q*. Okay. And at some point, did you decide that you needed to leave? Or what were you thinking of?

*A*. Yeah. Then, it just—it kept escalating. Like, it wasn't gonna [sic] get any better. And then, [BP], he was, like, putting his hands on his head and just

_____

[2] These children were not shared in common with Sean.

rocking back and forth, I think, just as a way to avoid it. And he didn't want to be in the middle of it. And then, that's when I started backing up.

*Q.* Okay.

*A.* And we were just gonna [sic] head back to my sister's.

*Q.* Okay.

*A.* I mean, I didn't really have a plan.

* * *

*Q.* Put it—so, you pulled it from park, put it in reverse. Were you looking to the right or the left or do you recall?

*A.* I was looking to the left, because I—I live on a busy—it's not a busy street, but people go fast. And so, I don't like usually backing up on it. But [Sean and Tina] were parked where I usually back up. But, so I was just really, like, looking left, making sure where they were and stuff. And so, I didn't see [BP] get out. I didn't really see it.

* * *

*Q.* Okay. All right. So, at some point, you became aware that the door opened?

*A.* Yeah. I didn't get very far. I mean, like, just, I put it in reverse, was looking back away. And then, all of a sudden, then the lights popped on. I look over, and [BP]'s gone. I mean, within seconds, so.

*Q.* Okay. Okay. Then, what did you do?

*A.* Then I immediately threw it in park and jumped out to see if he was okay.

At no point does the record give any indication that the custody dispute or the argument caused defendant to intentionally injure or batter Sean within the meaning of MCL 750.82 or MCL 750.81(2). At most, the evidence indicates that defendant panicked in a moment of extreme stress while in the middle of an argument with her ex-husband and attempted to get away from him by driving back to her sister's house.

The majority posits that the jury could have reasonably concluded that defendant's testimony, as well as an earlier statement given to a police trooper that she put the van in reverse in an attempt to escape the situation, are evidence that defendant contemplated her actions before executing them. The implication here, especially when paired with the supposition that defendant was angry at Sean over their custody dispute, is that defendant knew she would hit Sean if she put the car in reverse and did it anyway. But that defendant had a moment to think about how best to

-3-

escape a bad situation does not indicate that she had the *specific* intent to harm Sean in the process. There is no evidence, for example, that defendant asked Sean to step away from the car and hit him when he refused, or that she was contemplating his proximity to the car at all while trying to get away. Instead, it is apparent from the record that defendant struck Sean by accident during a high-conflict interaction, initiated by Sean. That this happened is no surprise, given the parties' tumultuous history. Even viewed in a light most favorable to the prosecution, this record does not support that defendant manifested the requisite specific intent necessary to commit felonious assault or domestic violence.

Finally, the majority opines that the jury must have simply found that defendant's testimony lacked credibility and was thus discounted by the jury in favor of the theory that she intended to strike Sean with the car door. Generally, "[t]his Court will not interfere with the trier of fact's determinations regarding the weight of the evidence or the credibility of witnesses." *Kanaan*, 278 Mich App at 619. But "doubt about credibility is not a substitute for evidence of guilt[.]" *People v Wolfe*, 440 Mich 508, 519; 489 NW2d 748 (1992). There must still be adequate evidence from which the jury may make such inferences. *Hoffmeister*, 394 Mich App at 159. On the basis of my review of the record, that evidence is lacking here. The prosecution failed to meet its burden to show that defendant possessed the requisite intent necessary to prove her guilty of felonious assault and domestic violence. Accordingly, I would reverse defendant's convictions and sentences.

/s/ Michelle M. Rick